IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:21-CV-433-FL

| | | |
|---|---|---|
| JONATHON HELSIUS, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | ORDER |
| RALEIGH-DURHAM AIRPORT AUTHORITY, | ) ) ) ) | |
| Defendant. | ) | |

This matter is before the court on defendant's motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), (DE 7), and plaintiff's motion to deny the same, (DE 14). Issues raised are ripe for ruling. For the following reasons, defendant's motion is granted, and plaintiff's motion is denied.

### STATEMENT OF THE CASE

Plaintiff commenced this action against his former employer November 25, 2019, in Wake County Superior Court, alleging wrongful discharge and violations of the United States Constitution, under 42 U.S.C. § 1983, and the North Carolina Constitution. Plaintiff filed an amended complaint in state court September 21, 2021, asserting the same claims. Plaintiff seeks compensatory damages, attorneys' fees, and costs.

Defendant removed the action to this court October 22, 2021, and thereafter filed the instant motion seeking dismissal of all claims as a matter of law. Plaintiff filed a response in opposition December 10, 2021, titled "Motion to Deny Defendants' [sic] Motion to Dismiss 12(b)(6)," along

with a memorandum of law. (DE 13). The clerk directed plaintiff to refile the documents as a motion and memorandum in support, whereupon plaintiff filed his instant motion. In the court's present assessment, however, plaintiff's motion is properly considered as a response to defendant's motion to dismiss.

Scheduling activities in the case have been stayed pending decision on the motion.

## STATEMENT OF FACTS

The facts alleged in plaintiff's complaint[1] may be summarized as follows. Defendant is an airport district and political subdivision of North Carolina with the authority to regulate and operate the Raleigh-Durham Airport ("RDU"). (Compl. (DE 1-2) ¶¶ 2-3). It is a public body exercising governmental powers. (Id. ¶ 2). Plaintiff began working for defendant's police department as a patrol squad supervisor in August 2015. (Id. ¶ 9). He was subsequently promoted to lieutenant and tasked with overseeing the department's special operations division. (Id. ¶ 10).

On April 13, 2018, plaintiff's colleague Sergeant Witherspoon ("Witherspoon")[2] reported to plaintiff that his squad had detained a captain with the Raleigh Police Department after he entered a checkpoint with a concealed weapon. (Id. ¶¶ 12-14). The captain was intoxicated at the time. (Id. ¶ 14). Rather than arresting the captain or writing him a citation, Lieutenant Dudley ("Dudley"), a fellow lieutenant, allegedly instructed the Witherspoon to "cut him loose." (Id. ¶ 15). Plaintiff followed up with Dudley, who explained he was giving the captain a "professional courtesy." (Id. ¶ 17). Plaintiff expressed his disagreement with the decision and asserted "he felt everyone should be charged regardless of their status at the Raleigh Police Department." (Id. ¶

---

[1] Hereinafter, all references to the complaint or "Compl." in citations are to the amended complaint filed in state court September 21, 2021, attached to defendant's notice of removal. (See Compl. (DE 1-2) beginning on page 26).

[2] Plaintiff failed to provide the first name of this and other employees identified.

2

18). A moment later, Major Edwards ("Edwards") called them both to a meeting with himself and vice president Duane Legan ("Legan"). (Id. ¶ 21). At that meeting, they discussed the matter of the captain, and "Edwards instructed Dudley to charge [the captain] with all appropriate criminal charges." (Id. ¶ 23).

According to the complaint, also on April 13, 2018,[3] Legan dispatched officers to the parking lot after blocking a woman, Michelle Boswell ("Boswell"), into a parking spot and demanding to see her identification. (Id. ¶¶ 24, 27). Legan alleged she was tailgating him and driving erratically, but Boswell alleged Legan cut her off and then yelled for her identification, a demand that she declined as he was in plain clothes and lacked police credentials. (Id. ¶¶ 25, 27-28). Boswell lodged a complaint as a result of the incident, which plaintiff investigated. (Id. ¶¶ 31-32). Plaintiff had allegedly heard Legan and Chief Myers ("Myers") joke on several occasions about how Legan would attempt to slow speeders down by waving a walkie talkie out the window "in a manner to make drivers believe he was a police officer." (Id. ¶¶ 35-36). Plaintiff followed up with an officer involved in the incident (hereinafter the "Boswell-Legan incident"), who told plaintiff "[d]on't talk about it, it didn't happen." (Id. ¶ 33). On that basis, plaintiff alleges "Myers had instructed the parties involved, and consequently the entire department, to refrain from speaking about the Boswell and Legan incident." (Id. ¶ 39).

On August 9, 2018, plaintiff learned that the department's canine unit would be moved from his division to the patrol division. (Id. ¶ 42). He met with Myers and Edwards, both supervisors, and his colleague, Dudley, to discuss the pending change. (Id. ¶ 43). The following day, on August 10, 2018, plaintiff "expressed his opposition to the decision to move the canine unit" to Edwards, who in turn allegedly "stated that [p]laintiff had good reasons and that he would

---

[3] Plaintiff's complaint lists the date as April 13, 2019, however that is a clear scrivener's error as plaintiff's employment with defendant was terminated October 28, 2018. (Compare Compl. ¶ 24, with ¶¶ 80-82).

3

meet with [Myers] when he returned from vacation." (Id. ¶ 44). On August 13, 2018, Edwards informed plaintiff he had spoken with Myers, and Myers had elected to move forward with the transfer. (Id. ¶ 45).

Plaintiff then invoked the department's "Open Door Policy" for resolving disputes and asked Edwards to assist him in setting up a meeting with Myers. (Id. ¶ 46). Plaintiff and Edwards sent Myers two meeting requests on Outlook, but Myers declined the first and did not respond to the second. (Id. ¶¶ 47-48). Instead, on August 23, 2018, Myers sent plaintiff a "lengthy email . . . that commended him on his leadership of his unit and provided several reasons why [Myers] believed the transfer of the canine unit to the patrol division was the best move for the department." (Id. ¶ 49). Plaintiff responded "in a very frank and honest manner about why he believed [Myers's] reasons to be deficient," which, according to plaintiff, "sent Myers into a rage." (Id. ¶¶ 50-51). Myers "abruptly ordered [p]laintiff into his office." (Id. ¶ 51).

When plaintiff arrived in Myers's office, Legan was already present, allegedly to act as a witness. (Id. ¶ 52). Myers then read an email from plaintiff aloud, sent in response to a message regarding a retirement plaque for a colleague. (Id. ¶ 53). Plaintiff copied Dudley in the email and relayed in his message that "he did not believe his opinion in the department was valued and that he would defer to someone else." (Id.). In explanation for such response, plaintiff stated that his intention was to "determine whether Dudley was going to inform [Myers] of what he had wrote [sic]." (Id. ¶ 54). According to the complaint, upon "providing this reasoning to Myers, Myers became furious and slammed a copy of the email down on his desk." (Id.). "Myers stated that he would not allow [p]laintiff to undermine him and that testing colleagues was inappropriate behavior." (Id. ¶ 55). "Plaintiff agreed he could have handled the situation better." (Id.).

4

Plaintiff and Myers thereafter "engaged in a lengthy discussion" wherein Myers allegedly made "numerous misrepresentations about how he determined the canine unit should be moved to the patrol division." (Id. ¶ 56). Plaintiff responded that he had "attempted to avail himself of his chain of command" when he voiced his objection, and Myers agreed that he had done so. (Id. ¶ 57). Legan then allegedly interjected and stated that, nevertheless, "from his perspective [p]laintiff's email to Myers was borderline insubordinate." (Id. ¶ 58). Further, "his conduct was not appropriate for a supervisor." (Id.).

The meeting ended with Myers's assurance that he "was putting off the decision to move the canine unit pending further consideration." (Id. ¶ 59). Legan also advised plaintiff that he would discuss departmental reorganization with another vice president the following week. (Id.).

Four days later, on August 27, 2018,[4] Edwards asked plaintiff to come to his office. (Id. ¶ 60). Plaintiff obliged, and, on arrival in Edward's office, Myers walked in behind him and closed the door. (Id.). Edwards then read plaintiff a "letter of reprimand" summarizing plaintiff's August 23, 2018, meeting with Myers and Legan and concluding with the statement: "Your interactions with Chief Myers and Vice President Legan demonstrated a behavior inconsistent with the airport's core values of integrity, respect, and team." (Id. ¶ 61). Edwards handed plaintiff a copy of the letter, atop which was a sticky note containing an appointment time with a psychologist. (Id. ¶ 62). Edwards allegedly explained that "in accordance with departmental policy, [p]laintiff had to report to a 'Fitness for Duty' evaluation." (Id.).

Plaintiff was informed he was being placed on administrative leave pending the outcome of the evaluation. (Id. ¶ 63). Edwards thereafter escorted plaintiff out of the building, and

---

[4] Plaintiff's complaint lists the date as August 27, 2019, however that is a clear scrivener's error as plaintiff thereafter provides that he attended an evaluation precipitated by the meeting on August 28, 2018, and plaintiff's employment was terminated October 28, 2018. (Compare Compl. ¶ 60, with ¶¶ 70, 80-82).

5

allegedly asked plaintiff, "what were you thinking saying all of that in front of [Legan]?"  (Id. ¶ 65).  "Plaintiff expressed his frustration by all the untruths being told" and informed Edwards that Myers had denied knowledge of plaintiff's objections to the canine unit being moved.  (Id. ¶ 66).  Edwards confirmed that Myers was in fact aware of plaintiff's objections and told plaintiff "not to say anything stupid in his evaluation and to hang in there for a few days."  (Id. ¶¶ 66-67).

Plaintiff attended his scheduled psychological evaluation on August 28, 2018.  (Id. ¶¶ 68, 70).  Once there, he allegedly learned that, contrary to Edwards's and Myers's representations, the appointment was not for a "Fitness for Duty" evaluation, but instead was meeting to determine whether such evaluation was necessary.  (Id. ¶¶ 68-69).  The psychologist determined it was not.  (Id. ¶ 70).  Plaintiff contends defendant ordered the evaluation "in an attempt to antagonize and provoke him."  (Id. ¶ 71).  Plaintiff remained on administrative leave for five weeks.  (Id. ¶ 75).  He asserts he was not informed during that time that he was under an internal affairs investigation or that he had violated defendant's policy.  (Id. ¶ 76).  According to the complaint, he also was not given the opportunity to provide a statement and "was never afforded due process pursuant to normal administrative processes established by defendant's internal affairs policy."  (Id. ¶¶ 78-79).

Plaintiff was instructed to attend a meeting with Edwards, Myers, and senior vice president Cleon Umphrey on October 28, 2018, and at the meeting Myers informed him "they had made the decision to dismiss [p]laintiff because he was not a good match with the department."  (Id. ¶ 76).  Myers presented plaintiff with a severance agreement, and allegedly informed plaintiff that if he signed it "his Form 5B would indicate he had resigned."  (Id. ¶ 83).  Plaintiff's Form 5B in fact states that he was dismissed, and provides plaintiff "was terminated for insubordination, lack of respect, and divisive behavior."  (Id. ¶ 86).

Plaintiff asserts his termination was in fact retaliation for his "refusal to abide by the 'thin blue line' and his lack of hesitancy to question the ethicalness of his supervisors and colleagues." (Id. ¶ 40).

**COURT'S DISCUSSION**

A.    Standard of Review

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).[5] "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).

B.    Analysis

    1.    Fourteenth Amendment Procedural Due Process Under 42 U.S.C. § 1983

Plaintiff alleges defendant terminated his employment without the opportunity for hearing or similar due process in violation of the Fourteenth Amendment. Defendant asserts plaintiff fails to plausibly assert that he had a property interest in continued employment. The court agrees.

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV §1. "To adequately allege a . . . procedural due process claim, [a plaintiff] must allege that [he] (1) lost something that fits into

---

[5]    Internal citations and quotation marks are omitted from all citations unless otherwise specified.

one of the three protected categories: life, liberty, or property, and (2) did not receive the minimum measure of procedural protection warranted under the circumstances." Strickland v. United States, 32 F.4th 311, 347 (4th Cir. 2022). "In assessing a procedural due process claim, unless there has been a deprivation of a protected liberty or property interest by state action, the question of what process is required is irrelevant, for the constitutional right to due process is simply not implicated." Iota Xi Chapter Of Sigma Chi Fraternity v. Patterson, 566 F.3d 138, 146 (4th Cir. 2009); Stone v. Univ. of Maryland Med. Sys. Corp., 855 F.2d 167, 172 (4th Cir. 1988) (same, for both "substantive or procedural" due process claims).

"The Supreme Court has identified 'certain attributes of 'property' interests protected by procedural due process.'" Strickland, 32 F.4th at 348 (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)).

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

408 U.S. at 577. Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Id. "A 'person's interest in a benefit is a 'property' interest for due process purposes if there are rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing.'" Strickland, 32 F.4th at 348 (quoting Perry v. Sindermann, 408 U.S. 593, 601 (1972)).

The United States Court of Appeals for the Fourth Circuit has recognized that "[t]he procedural safeguards encompassed by the due process clause extend to [a plaintiff's] continued employment only if [he] had a property interest in that employment." Pittman v. Wilson Cnty., 839 F.2d 225, 226 (4th Cir. 1988). "[A]lthough a property interest in employment can be created

8

by statute, ordinance, or express or implied contract, the sufficiency of the claim of entitlement must be decided by reference to state law." Id. at 227.

As a general rule under North Carolina law, "a contract of employment, even [where] it expressly refers to the employment as 'a regular, permanent job,' is terminable at the will of either party irrespective of the quality of performance by the other party." Still v. Lance, 279 N.C. 254, 259 (1971). Exceptions to that rule exist where the termination violates a contractual right, public policy, or a statute or ordinance. Pittman, 839 F.2d at 229. Thus, under North Carolina law, a plaintiff has a legitimate claim of entitlement to, and thus a property interest in, continued employment where there exists (1) a public policy exception; (2) a "contractual agreement between an employer and employee establishing a definite period of employment"; or (3) "a statute or ordinance provid[ing] for restrictions on the discharge of an employee." Id. at 227 (emphasis omitted). Plaintiff suggests he has a property interest on the basis of each of these exceptions, which the court will address in turn below.

      a.      Property Interest Pursuant to Public Policy

Plaintiff contends that he was terminated in violation of public policy as defendant "intentionally sought to terminate [p]laintiff after he expressed knowledge of police misconduct." (Compl. (DE 1-2) ¶ 91).

Under the public-policy exception to the at-will-employment rule, "while there may be a right to terminate a contract at will for no reason, or for an arbitrary or irrational reason, there can be no right to terminate such a contract for an unlawful reason or purpose that contravenes public policy." Coman v. Thomas Mfg. Co., 325 N.C. 172, 175 (1989). The North Carolina Supreme Court has broadly defined public policy as "the principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good." Id.

9

at 175 n.2. Though it has declined to delineate the outer contours of this definition, allowing this "still evolving area of the law to mature slowly," the North Carolina Supreme Court has offered the following guidance:

> Although the definition of "public policy" approved by this Court does not include a laundry list of what is or is not "injurious to the public or against the public good," at the very least public policy is violated when an employee is fired in contravention of express policy declarations contained in the North Carolina General Statutes.

Amos v. Oakdale Knitting Co., 331 N.C. 348, 353 & n.1 (1992); see Coman, 325 N.C. at 176 (looking to statutory provisions for "evidence of the public policy of [North Carolina]")

Plaintiff has not cited to any statutory or constitutional provision that defendant purportedly violated when it engaged in the alleged misconduct. Indeed, particularly with respect to plaintiff's first example of wrongdoing regarding the captain with the Raleigh Police Department, who was discovered with a concealed weapon and intoxicated, it is not entirely clear what the misconduct was. Namely, upon discovering that plaintiff's colleague Dudley had extended the captain a professional courtesy and declined to detain him, plaintiff's supervisor Edwards "instructed Dudley to charge [the captain] with all appropriate criminal charges." (Compl. (DE 1-2) ¶ 23).

Even assuming defendants conduct did in fact violate a statutory or constitutional provision, plaintiff has not plausibly alleged that his knowledge of that misconduct is what caused him to be terminated. First, at no point does plaintiff plead that he expressed or otherwise reported that he was aware of the misconduct. Second, on the facts alleged, plaintiff was terminated because of his interactions with supervisors, unrelated to any alleged misconduct by them and colleagues.

In particular, plaintiff alleges his supervisor, Chief Myers, sent him a "lengthy email . . . commend[ing] [plaintiff] on his leadership of his unit" and explaining why Myers believed a departmental reorganization, namely the transfer of the canine unit, "was the best move for the department." (Compl. (DE 1-2) ¶ 49). Plaintiff responded to Myers "in a very frank and honest

manner about why he believed [Myers's] reasons to be deficient." (Id. ¶ 50). Plaintiff identified his "very frank and honest" response as the trigger that "sent Myers into a rage and [Myers] abruptly ordered [p]laintiff into his office." (Id. ¶¶ 50, 51).

Once in Myers's office, vice president Legan, also present, described plaintiff's email as "borderline unsubordinated." (Id. ¶ 58). During the meeting, plaintiff also admitted to copying a colleague, Dudley, in an unrelated email for the purpose of testing whether Dudley would inform Myers of the content of the message. (Id. ¶¶ 53-54). Plaintiff that alleges that "upon providing this reasoning to Myers, Myers became furious and slammed a copy of the email down on his desk." (Id. ¶ 54). Myers described plaintiff's deportment as "undermin[ing]," and Legan expressed that plaintiff's conduct "was not appropriate for a supervisor." (Id. ¶¶ 55, 58).

Plaintiff received a letter of reprimand four days later, and that letter cited his meeting with Legan and Myers, providing that his interactions with both superiors "demonstrated a behavior inconsistent with the airport's core values of integrity, respect, and team." (Id. ¶ 61). Upon being escorted out of the building, plaintiff's supervisor Edwards also referenced the meeting, asking "[w]hat were you thinking saying all of that in front of [Legan]." (Id. ¶ 65). Plaintiff was thereafter terminated, and his Form 5B in fact provides he "was terminated for insubordination, lack of respect, and divisive behavior." (Id. ¶ 86). In sum, by his own accord, plaintiff was terminated for his interactions with his superiors Legan and Myers, (Id. ¶ 65), and the allegations in the complaint do not permit an inference that he was terminated for his purported knowledge of misconduct.

Plaintiff's arguments to the contrary are unavailing. Plaintiff first asserts that Myers resented him after he "rebuffed the idea of allowing [the Raleigh police captain] to leave without being issued an official citation." (Pl. Resp. (DE 15) at 9-10). Plaintiff, however, does not allege

11

in his complaint that Myers was involved in that decision. Rather, Dudley instructed a colleague to allow the captain the leave, and then in a meeting between plaintiff, Dudley, Edwards, and Legan, Edwards overruled Dudley and told him to charge the captain with all appropriate charges. (Compl. (DE 1-2) ¶¶ 15-23). On these facts, it would be unreasonable to infer that Myers, who was not present at the meeting, and whose subordinate, Edwards, overruled Dudley in accordance with plaintiff's view, resented plaintiff and therefore terminated him four months later on that basis.

Plaintiff additionally points to the Boswell-Legan incident and asserts that he was terminated because he declined to "overlook the inappropriate actions" of Myers and Legan. (Pl. Resp. (DE 15) at 10). As alleged in the complaint, such inappropriate actions included Legan allegedly insinuating he was an officer and Myers directing the department to refrain from speaking about it. (Compl. ¶¶ 27-28, 33). Plaintiff, however, does not allege that Myers knew plaintiff was aware of the incident or that plaintiff perceived the actions as inappropriate and disapproved.

Plaintiff thus fails to plead facts supporting a plausible causal connection between his knowledge of alleged police misconduct and his termination. He accordingly has not alleged facts demonstrating that he was terminated in violation of public policy, and thus has failed to demonstrate a property interest in continued employment on that basis. See Coman, 325 N.C. at 175.

        b.      Property Interest Pursuant to Contract or Employment Policy

Plaintiff additionally asserts that defendant's internal affairs policy establishes "normal administrative processes" he was not afforded prior to his termination. (Compl. (DE 1-2) ¶ 79). Plaintiff does not specify what these processes entail or specifically protect beyond asserting that

they "guarantee certain rights" to "administrative and law enforcement personnel." (Id. ¶¶ 99, 110). Without additional detail regarding their substance the court cannot evaluate whether these policies created a property interest in plaintiff's employment, for instance by establishing a definite term of employment or providing that employees can only be terminated for cause. See Pittman, 839 F.2d at 229 (holding that procedures and policies the town allegedly used in hearing plaintiff's grievances, making investigations, and deciding plaintiff's termination, are "administrative in nature" rather than a guarantee of property interests).

Further, plaintiff does not allege that these policies have been incorporated into an ordinance or statute or were otherwise "adopted with the requisite formality and intent under North Carolina law." Id. Nor does he allege that they were included in his employment contract, or that he relied upon them "in accepting or continuing [his] employment." Id. 228 n.5. Plaintiff accordingly failed to plausibly assert that he had a property interest in continued employment. See Wuchte v. McNeil, 130 N.C. App. 738, 741-42 (1998) (holding that a Durham police officer, terminated without being afforded procedures provided by the city's personnel policies, could not state a claim for wrongful termination without evidence that his employment contract, a statute, or an ordinance provided that he could only be dismissed for good cause).

In sum, plaintiff does not allege facts sufficient to give rise to a plausible inference of a deprivation of a property interest, and he therefore fails to state a claim for violation of due process under the Fourteenth Amendment. Defendant's motion to dismiss count II of the complaint is accordingly granted.

2. Wrongful Termination

Plaintiff alleges he was wrongfully terminated after he expressed knowledge of police misconduct, citing to violation of public policy. Pursuant to the foregoing analysis, however,

13

plaintiff fails to state a claim for termination in contravention of public policy. Plaintiff's wrongful termination claim is thus dismissed on the same basis.

In arguing to the contrary in his response to the instant motion, plaintiff raises for the first time a basis for his claim in addition to alleged police misconduct, asserting Myers "did not like the fact that [p]laintiff operated a 'well-oiled', cohesive, and 'well-trained unit'" and consequently terminated plaintiff because of his "personal feelings" towards him. (Pl. Resp. (DE 15) at 7-8). This argument is without merit, for two reasons. First, plaintiff does not plead any facts supporting such motive. Indeed, he alleges Myers "commended him on his leadership of his unit." (Compl. (DE 1-2) ¶ 49). Second, as plaintiff is presumed to be an at-will employee, defendant was entitled to retaliate against him, or fire him "for no reason, or for an arbitrary or irrational reason," so long as the employer does not contravene public policy in so doing. Coman, 325 N.C. at 175; see Schwarz, 270 N.C. App. at 726 ("[E]mployers generally are free to "retaliate" against their at-will employees by firing them for conduct of which they disapprove."). Here, on the facts alleged, defendant did not violate public policy.

Accordingly, plaintiff's wrongful termination claim fails as a matter of law and must be dismissed.

3. North Carolina Constitution

Plaintiff alleges defendant violated Article I, Sections 1 and 19 of the North Carolina Constitution. He does not, however, demonstrate that no other state law remedy is available, and his claims thus fails on that basis. See Tully v. City of Wilmington, 370 N.C. 527, 537 (2018).

In addition, and in the alternative, plaintiff fails to allege sufficient facts to state claims under the North Carolina Constitution, for the reasons set forth as follows.

a. Article I, Section 1

Plaintiff asserts his termination violated his right to the fruits of his labor guaranteed by Article I, Section 1 of the North Carolina Constitution. This provision ensures each person the right to "life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness." N.C. Const. art. I, § 1. "[It] applies when a governmental entity acts in an arbitrary and capricious manner toward one of its employees by failing to abide by promotional procedures that the employer itself put in place." Tully, 370 N.C. at 535-36.

To state a claim grounded in this right, a public employee must "plead facts establishing three elements: (1) a clear, established rule or policy existed regarding the employment promotional process that furthered a legitimate governmental interest; (2) the employer violated that policy; and (3) the plaintiff was injured as a result of that violation." Id. at 537.

Plaintiff alleges he "was never afforded due process pursuant to normal administrative policies established by [d]efendant's internal affairs policy." (Compl. (DE 1-2) ¶ 79). He alleges "[t]hese policies and procedures guarantee certain rights" to "administrative and law enforcement personnel." (Id. ¶¶ 99, 110). Allegations of a "normal" policy guaranteeing "certain" rights, however, are insufficiently vague to demonstrate "a clear, established rule or policy existed" and that defendant violated it. See Tully, 370 N.C. at 537.

Plaintiff thus fails to state a claim for violation of his right to the fruits of his labor under Article I, Section 1 of the North Carolina Constitution. Defendant's motion to dismiss plaintiff's claims is therefore granted in this part.

      b.      Article I, Section 19

Plaintiff contends his termination also violated his right to property in contravention of Article I, Section 19 of the North Carolina Constitution, which provides that: "No person shall be . . . deprived of his . . . property, but by the law of the land." N.C. Const. art. I, § 19. "'[L]aw of

15

Case 5:21-cv-00433-FL   Document 16   Filed 07/07/22   Page 15 of 16

the land' is synonymous with 'due process of law,' a phrase appearing in the Federal Constitution and the organic law of many states." Tully, 370 N.C. at 538. As with the Federal Constitution, "[i]n analyzing a due process claim [under the North Carolina Constitution], we first need to determine whether a constitutionally protected property interest exists." Id. "To demonstrate a property interest under the [North Carolina Constitution], a party must show more than a mere expectation; he must have a legitimate claim of entitlement." Id.

Pursuant to the foregoing analysis in relation to plaintiff's federal due process claim, the sufficiency of which was determined by reference to North Carolina law, plaintiff fails to establish a "legitimate claim of entitlement" to continued employment. Id.

Therefore, plaintiff fails to allege sufficient facts stating claims under the North Carolina Constitution.

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss (DE 7) is GRANTED and plaintiff's motion to deny the same is DENIED (DE 14). Plaintiff's claims are DISMISSED for failure to state a claim upon which relief can be granted, under Rule 12(b)(6). The clerk is DIRECTED to close this case.

SO ORDERED, this the 7th day of July, 2022.

_____
LOUISE W. FLANAGAN
United States District Judge